ANTONA (Case No. 492)

were being carried under a bill of lading which excepted the dangers of the seas: *Held*, that the injury to the bags was not caused by the dangers excepted, and that the ship was liable for the damage.

[Cited in The H. G. Johnson, 48 Fed. 697.]

[See note at end of case.]

In admiralty.

Townsend Scudder, for libellants.
James D. Reymert, for claimant.

[NOTE. As to the point that a carrier is bound to observe reasonable care in loading and stowing chemicals or bleaching powders, see The St. Patrick, 7 Fed. 125; The Kate Irving, 5 Fed. 630; The Pharos, 9 Fed. 912.]

## Case No. 492.

### The ANTONA.

[Blatchf. Prize Cas. 572.][1]

District Court, S. D. New York. Dec. 23, 1863.

PRIZE—ATTEMPT TO VIOLATE BLOCKADE.

Vessel and cargo condemned for an attempt to violate the blockade.

In admiralty.

BETTS, District Judge. The steamer Antona and cargo were captured off Cape San Blas, Florida, by the United States war vessel Kittatinny, January 6, 1863, as prize of war. The vessel and cargo having been appropriated by the government at the appraised valuation of $76,353.09, a libel was filed for the condemnation thereof, May 25, 1863, and the warrant and monition were thereupon made returnable in court June 26th thereafter, and, being served by publication and returned in court by the marshal, on motion of the United States attorney, in open court, the default of all persons interested in the said vessel or cargo, in not appearing to the said monition, was ordered and taken. By the joint consent in writing, of the United States attorney and the counsel for the captors, executed July 2, 1863, and on application of the proctors for the claimants, the default was vacated by order of the court, and, on the 3rd of September thereafter, a claim and answer, by consent of the United States attorney, was filed on behalf of J. and T. Johnson, merchants of Liverpool, England, owners of the vessel and cargo, by Edwin Gerard, their agent. The answer and claim denies in general, all the allegations made in the libel, and the jurisdiction of the court over the cause. It admits the taking of the vessel and cargo for the use of the United States, but charges that the same were unlawfully taken, without the intervention of any prize tribunal, and were unlawfully converted by the captors in the port of New Orleans; and it denies that the prize property was ever duly appraised by a board of naval survey or otherwise, or was brought within the jurisdiction of this court. The test oath made by the agent, solely, asserts no fact in relation to the ownership of the vessel or cargo, or the acts of the captors in its seizure or disposal, as within his personal knowledge.

The case was brought to hearing at the present term, upon the proofs in preparatorio and the ship's papers and the argument of the United States attorney, no brief or

---

[1] [Reported by Samuel Blatchford, Esq.]

argument on the part of the claimants having been furnished to the court, nor any application for further proofs made by the claimants.

The certificate of British registry, dated Glasgow, April 24, 1860, states that David Sloan and others, of the county of Lanark, were the owners of the Antona, and an indorsement on the same registry shows that George Wigg, of Liverpool, was on the 16th of October, 1862, the owner of 64 shares of the vessel. The shipping agreement with the crew, dated Liverpool, October 31, 1862, is for a voyage from that port to Havana and Nassau, N. P., and back to a port of final discharge in the United Kingdom. There is a charter party, dated October 23, 1862, from George Wigg, owner of the vessel, (George Grindle, master,) to John and Thomas Johnson of Liverpool, for a voyage to Nassau and Havana, with liberty to touch at intermediary ports for coals, &c. No mention is made in the shipping papers, of the destination of the vessel to Matamoras. There is a clearance of the ship from Liverpool, November 1, 1862. The bills of lading of the cargo are all drawn to order, in blank, for the delivery of the cargo at Nassau, and no designation is made on them, or contained in any papers of the vessel respecting the cargo, that it comprehends any other than lawful merchandise and ordinary supplies for the ship's company, or that it is deliverable elsewhere than at Nassau. The prize commissioners, on the 14th of September, 1863, reported to the court a sworn inventory of the lading of the prize, as consisting, in gross, of 618¼ chests of tea, 1 case of needles, 1 case of sample shoes, 40 cases of boots and shoes, 541 cases of brandy, 1 case and 2 barrels of sample crockery, 1 case of army buttons, 1 case of calf skins, 4 barrels of salt provisions, 4 cases of clothing, 1 cask of files, 1 case of assorted brushes, 3 coils of hemp, 2 gentleman's coats, 29 casks of wine, 36 iron cans (patent) of caustic soda, 29 crates of crockery, and 5 cases of drugs.

The facts testified to by the ship's company, on the depositions in preparatorio, on the 12th, 14th and 15th of May, 1863, in their clear bearing and results, prove that the voyage undertaken by the Antona was set on foot and conducted with the design to run the blockade of the port of Mobile, and furnish her cargo to the use of the enemy within the rebellious states.

The master deposes that the capture of the prize was made January 6, 1863; at 11 P. M. in latitude about 28° 50′ north, and longitude 86° 11′ west; that the vessel was taken to the blockading squadron off Mobile, thirty-six or forty hours after her capture; that she was bound to Matamoras; that, when captured, she was on her way back to Havana, in consequence of having had to throw coal overboard to lighten her, because of having had heavy weather; that the voyage began at Liverpool, and was to have ended at Nassau; that from Havana the vessel went, on the 31st of December, towards Matamoras; that he had been at anchor before the capture, waiting for daylight to see the land, having been driven back northward in the heavy weather; that he wished to ascertain about his chronometer before returning to Havana; that, from the loss of coal, he would not have been able to complete the voyage to Matamoras; that he had just raised his anchor when the capturing vessel came in sight; that he believes that the cargo was consigned to order, on his arrival at Matamoras; that he expected these instructions from his agents at Nassau; that he should have waited for those instructions before disposing of his cargo; that he took a Gulf pilot on board to give him information, as he (the master) was unacquainted with the Gulf navigation; that he does not know the name of that pilot, or that his name was entered in the log-book; that when he raised his anchor he steered from the vessel which came in sight, and observed that she followed him 13 or 14 hours; that the Antona altered her course during the chase about 2½ points; that she had always been on the course of her destination on the ship's papers until he determined to return to Havana, in consequence of having been exposed to severe weather; and that the destination of the vessel at the time of her capture was Matamoras.

The testimony of Grindle, the master, has been stated more fully, to give the claimants the largest benefit they can derive from the statements and exculpation of the commanding officer under whose charge and directions the vessel and cargo were when captured. Only three other witnesses were examined—Horace Pontet, rated as boy on board the vessel, on the 12th of May, 1863, and William Cumming, first mate, and John Patterson, carpenter, both on the 15th of May, 1863.

The boy states no facts of any moment, not appearing to know anything other than outside occurrences common to a trading voyage from a port in England to another in the Gulf of Mexico.

The testimony of the mate and the carpenter is directly in conflict with that of Grindle, the master, and, if credited, proves beyond doubt that the design and effort of the master, after reaching Havana, were to run the vessel and cargo into the blockaded port of Mobile, and, also, that such was the purpose of his voyage from its inception. The facts stated by Cumming and Patterson are in essential accordance, where they speak of things known to both of them, and they only differ on matters having a material bearing upon the guilt or innocency of the enterprise, where they relate particulars as being within their separate individual knowledge. For instance, Patterson, the

carpenter, asserts it as within his knowledge that the vessel was in part laden with powder; and the mate is more positive and exact as to the movements of the vessel and soundings of her course taken along the shore to guide her progress into Mobile. Both of the witnesses are very clear and positive in their asseverations that the Antona went from Havana with the design to run directly into Mobile, and never was bound for Matamoras, or contemplated going to Nassau. They assert that the master took on board a man who was understood to be a resident of Mobile, as a Gulf pilot; that they were paid each a considerable sum of money at Havana, by the master, to keep silence as to the purpose and destination of the vessel; and that it was understood by the ship's company on board that she was to go where she had no right to go. Cumming, the mate, says that when he inquired of the master after leaving Havana, where the vessel was going to, his reply was that it was none of his business; that he had never heard that she was bound to Matamoras; that, when captured, was wide off the course given upon her papers and was going up along the coast towards Mobile; that her course was altered, by order of the master, 12 or 14 points on the appearance of the capturing vessel, and that she was chased. Patterson says that it was the common report on board, after leaving Havana, that the vessel was to run the blockade. Cumming says that the Antona made all sail to avoid being taken by the capturing vessel, and that 31 shotted guns were fired at her before she came to.

The log-book shows that the course of the Antona, after she left Havana, until she anchored close in on the Florida coast in 5 fathoms of water, on the 5th of January, was, generally, northwest or northwest by west.

From all the facts in proof it is clear, in my opinion, that, when arrested, the vessel was actively engaged in the endeavor to enter the port of Mobile, in violation of the blockade known by her master to be then maintained there. A decree of condemnation and forfeiture must be entered.